J. Bryan Quesenberry
903 East 430 South
Salem, UT 84653
801-473-9951
jbq.esq@gmail.com
*Plaintiff/Relator*



SEALED

FILED ☑   LODGED ___
RECEIVED ___   COPY ___

JUN 1 2 2023

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

CV23-01067-PHX-SMM

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>ex</u> <u>rel</u>. J. BRYAN QUESENBERRY, | **COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT** |
| Plaintiff, | |
| vs. | **(Filed in camera and under seal) (DO NOT PLACE ON PACER)** |
| JTF ENTERPRISES, INC. d/b/a THE CANDY STORE; 4716 INC. d/b/a HI-LITER GENTLEMEN'S CLUB; OUT WEST VENTURES, INC. d/b/a CHRISTIE'S CABARET; STETSON DESERT PROJECT LLC d/b/a LE GIRLS GENTLEMEN'S CLUB; CIRCLE E RANCH LLC; CIRCLE E OIL AND CHEMICALS LLC; and GEORGE KROTONSKY, | **JURY TRIAL DEMANDED**  Civil Action No. _____ |
| Defendants. | |

Plaintiff-Relator J. Bryan Quesenberry, a licensed attorney acting *pro se* on behalf of the United States of America (the **"Government"** or the **"Federal Government"**) and against Defendants, alleges based upon personal knowledge, relevant documents, information, and belief, as follows.

## INTRODUCTION AND HISTORY OF THE FALSE CLAIMS ACT

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements, and claims made and caused to be made by Defendants and/or their agents and employees, in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (**"FCA"**).

2.      This action seeks to recover hundreds of thousands of federal dollars wrongfully loaned to the Defendants through the Federal Government's Payroll Protection Program (**"PPP"**). The PPP provides a pathway to borrowers to receive forgiveness of these loans.

3.      Pursuant to the PPP, the Federal Government spent hundreds of billions of dollars in stimulus funding, as well as other federal funding, to support and aid legitimate businesses through the coronavirus pandemic.

4.      This action alleges that Defendants applied for PPP funds and received PPP funds despite the PPP rules and court case law prohibiting applicants from receiving PPP funds if they were sexually oriented businesses. This prohibition is further described below.

5.      The FCA was enacted during the Civil War, and was substantially amended in 1986, and again in 2009 and 2010. Congress amended the FCA in 1986 to enhance the Federal Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the FCA, which Congress characterized as a primary tool for combating government fraud, was in need of modernization. The amendments create incentives for individuals to come

forward with information about fraud against the Federal Government without fear of reprisals or inaction, and enable the use of private legal resources to prosecute fraud claims on the Federal Government's behalf.

6.      The FCA prohibits, *inter alia*: (1) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; and (2) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim. 31 U.S.C. §§ 3729(a)(1)(A), (B). Anyone who violates the FCA is liable for a civil penalty for each such claim, **plus three times the amount of the damages** sustained by the Government. 31 U.S.C. § 3729(a)(1)(A) (as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 [28 U.S.C. § 2461 note; Public Law 104-410]).

7.      In 2009, Congress amended the FCA to clarify that a "claim" includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest…" 31 U.S.C. § 3729(b)(2).

8.      The FCA allows any person having information about an FCA violation to bring an action for himself and the Federal Government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days

(without service on Defendants during that time) to allow the Federal Government time to conduct its own investigation and to determine whether to join the suit.

9.    Based on the foregoing laws, *qui tam* Plaintiff/Relator seeks through this action to recover all available damages, civil penalties, and other relief for the violations alleged herein in every jurisdiction to which Defendants' misconduct has extended.

## PARTIES

10.    Plaintiff/Relator J. Bryan Quesenberry (**"Relator"**) is a resident of Utah. He is an attorney licensed to practice law in Utah and brings this action on behalf of the United States of America, the real party in interest.

**DEFENDANT JTF ENTERPRISES, INC. D/B/A THE CANDY STORE**

11.    Defendant JTF Enterprises, Inc., which does business as "The Candy Store" (**"Candy Store"**), is an Arizona entity located at 15240 North Clubgate Drive #133, Scottsdale, AZ 85254 and was formed on May 22, 1996, with a principal place of business in Maricopa County, Arizona.

12.    The Candy Store applied and was approved for a PPP loan on April 6, 2020 (loan number 5837647003), received said PPP loan, and had said PPP loan forgiven on May 14, 2021, in the amount of $111,703.22.

13.    The Candy Store applied and was approved for a second-round PPP loan on February 17, 2021 (loan number 9829558408), received said PPP loan, and had said PPP loan forgiven on June 7, 2022, in the amount of $156,716.93.

14.    Upon information and belief, the Candy Store is a topless strip club with the website www.thecandystoreshowclub.com and a Facebook page

(www.facebook.com/cstorephx/), which refers to the enterprise as "the valleys [sic]

BEST KEPT SECRET in topples [sic] entertainment!"

**DEFENDANT 4716, INC. D/B/A HI-LITER GENTLEMEN'S CLUB**

15.     Defendant 4716, Inc., which does business as "Hi-Liter Gentlemen's Club"

**("Hi-Liter Gentlemen's Club")** is an Arizona entity located at 4716 North 12th Street,

Phoenix, AZ 85014 and was formed July 22, 1991, with a principal place of business in

Maricopa County, Arizona.

16.     Hi-Liter Gentlemen's Club applied and was approved for a PPP loan on

June 23, 2020 (loan number 1929128006), received said PPP loan, and had said PPP loan

forgiven on October 4, 2021, in the amount of $194,299.86.

17.     Hi-Liter Gentlemen's Club applied and was approved for a second-round

PPP loan on January 25, 2021 (loan number 5661668305), received said PPP loan, and

had said PPP loan forgiven on October 6, 2021, in the amount of $205,517.29.

18.     Upon information and belief, Hi-Liter Gentlemen's Club is a nude strip

club with the website www.hiliterclubaz.com, which states, in part, "The Hi Liter has

always been known to mix sexy entertainment with our exceptional food & liquor." The

home page on this website features scantily clad dancers.

19.     Hi-Liter Gentlemen's Club was a defendant in four civil cases filed in U.S.

District Court for the District of Arizona: 1) *Vroman, et al. v. 4716 Incorporated, et al.*,

case number 2:1997-cv-00807, filed on 03/20/1997; 2) *Faltoni v. 4716 Incorporated et*

*al.*, case number 2:2018-cv-00825, filed on 03/13/2018; 3) *Pinder et al. v. 4716*

*Incorporated et al.*, case number 2:2018-cv-02503, filed on 08/07/2018, and 4)

*Cabanillas v. 4716 Incorporated et al.*, case number 2:2020-cv-00894, filed on 05/07/2020.

20.      In the *Vroman* case, Hi-Liter Gentlemen's Club was referred to as "4716 Incorporated an Arizona corporation d/b/a The Hi-Liter Showclub doing business as Hi-Liter Showclub." In the *Faltoni* case, Hi-Liter Gentlemen's Club was referred to as "4716 Incorporated doing business as Hi Liter Gentleman's Club." The lead plaintiff, Valentina Faltoni, described herself as an exotic dancer. In the *Pinder* case, Hi-Liter Gentlemen's Club was referred to as "4716 Incorporated an Arizona corporation doing business as Hi Liter." In the *Cabanillas* case, Hi-Liter Gentlemen's Club was referred to as "4716 Incorporated an Arizona corporation doing business as Hi Liter Gentlemen's Club." In the *Cabanillas* case, the plaintiffs are described as "all current and former exotic dancers/entertainers who worked at HiLiter located at 4716 N 12th Street, Phoenix, Arizona 85014 at any time starting three (3) years before this Complaint was filed, up to the present."

**DEFENDANT OUT WEST VENTURES, INC. D/B/A CHRISTIE'S CABARET**

21.      Defendant Out West Ventures, Inc.,[1] which also does business as "Christie's Cabaret" **("Christie's Cabaret")**, is an Arizona entity located at 1675 West Baseline Road, Tempe, AZ 85283 that was formed June 1, 2001, with a principal place of business in Maricopa County, Arizona.

---

[1] Out West Ventures, Inc. is the legal name of this entity even though it is listed as "Outwest Ventures, Inc." in the SBA's PPP database.

22.    Christie's Cabaret applied and was approved for a PPP loan on May 2, 2020 (loan number 9482787302), received said PPP loan, and had said PPP loan forgiven on May 6, 2021, in the amount of $197,919.97.

23.    Upon information and belief, Christie's Cabaret is a topless strip club whose Facebook page (https://www.facebook.com/christiesoftempe/) refers to Christie's Cabaret as a strip club.

24.    Christie's Cabaret, identified as "Outwest Ventures Incorporated," was a plaintiff in *Cordova Entertainment et al. v. Town of Guadalupe*, case number 2:2001-cv-01794, filed on 9/24/2001 in U.S. District Court for the District of Arizona. One finding in the "Findings of Fact and Conclusions of Law," filed on 12/27/2001 stated: "Plaintiffs desire to present constitutionally protected, artistic and choreographed erotic striptease dance performances by women at their premises."

**DEFENDANT STETSON DESERT PROJECT, LLC D/B/A LE GIRLS GENTLEMEN'S CLUB**

25.    Defendant Stetson Desert Project, LLC, which does business as "Le Girls Gentlemen's Club" (**"Le Girls Gentlemen's Club"**), is an Arizona entity located at 5151 East Washington Street, Phoenix, AZ 85034, and was formed November 23, 2011, with a principal place of business in Maricopa County, Arizona.

26.    Le Girls Gentlemen's Club applied and was approved for a PPP loan on April 13, 2020 (loan number 4394487107), received said PPP loan, and had said PPP loan forgiven on March 30, 2021, in the amount of $157,613.30.

27.    Le Girls Gentlemen's Club applied and was approved for a second round
PPP loan on January 25, 2021 (loan number 5442418300), received said PPP loan, and
had said PPP loan forgiven on November 3, 2021, in the amount of $170,309.75.

28.    Upon information and belief, Le Girls Gentlemen's Club is a nude strip
club with the website www.legirls.net, which features photos of scantily clad women and
states, "HELLO sexy, come inside and have a cocktail… Don't mind our Le Girls they
like to take all their clothes off."

29.    Le Girls Gentlemen's Club was sued six times in U.S. District Court for the
District of Arizona: 1) *Ortiz v. Stetson Desert Project LLC, et al.*, case number 2:2014-
cv-00100, filed 01/17/2014; 2) *Pisciotti v. Stetson Desert Project LLC, et al.*, case
number 2:2014-cv-02632, filed 12/04/2014; 3) *Tijerino v. Stetson Desert Project LLC, et
al.*, case number 2:2015-cv-02563, filed 12/16/2015; 4) *Toliver v. Stetson Desert Project
LLC, et al.*, case number 2:2015-cv-02564, filed 12/16/2015; 5) *Unknown Party v.
Stetson Desert Project LLC et al.*, case number 2:2016-cv-00408, filed 2/12/2016; and 6)
*Manes et al. v. Stetson Desert Project LLC et al.*, case number 2:2018-cv-04664, filed
12/13/2018.

30.    In the *Ortiz* case, the lead defendant is referred to as "Stetson Desert Project
LLC an Arizona Limited Liability Company doing business as Le' Girls Cabaret." In the
*Pisciotti* case, the lead defendant is referred to as "Stetson Desert Project LLC doing
business as Le Girls." In the *Tijerino* case, the lead defendant is referred to as "Stetson
Desert Project LLC doing business as Le Girls Cabaret." In the *Toliver* case, the lead
defendant is referred to as "Stetson Desert Project LLC doing business as Le Girls

Cabaret." In the *Unknown Party* case, the lead defendant is referred to as "Stetson Desert Project LLC, an Arizona LLC doing business as Le Girls Cabaret." According to the complaint in the *Unknown Party* case, "Defendants own and operate Le Girls Gentlemen's Club, a strip club located in Phoenix, Arizona." In the *Manes* case, the lead defendant is referred to as "Stetson Desert Project LLC doing business as Le Girls' Gentlemen's Club." According to the *Manes* complaint, the lead plaintiff, Ashley Manes, worked as an exotic dancer at the defendants' adult entertainment club.

**DEFENDANT CIRCLE E RANCH LLC**

31.    Defendant Circle E Ranch LLC **("Circle E Ranch")** is an Arizona entity located at 24955 North Sage Haven Drive, Paulden, AZ 86334 (according to SBA records). Circle E Ranch has its principal place of business at 1928 West Weldon Avenue, Phoenix, AZ 85105 (according to Arizona Corporations Commission **("ACC")** records), and was formed on May 28, 2014.

32.    Circle E Ranch applied and was approved for a PPP loan on March 25, 2021 (loan number 9172848602) in the amount of $706,377 and received said PPP loan. The forgiveness status of this loan is unclear from the SBA database.

33.    Circle E Ranch reported 42 employees on its application for this PPP loan. Despite having this many employees, Circle E Ranch has virtually no internet presence. A Google search of the name Circle E Ranch yielded few hits, most of which were references to PPP databases.

34.    More than five years <u>before</u> Circle E Ranch applied for and received this PPP loan, it had filed articles of termination and thus was no longer a going concern or viable Arizona entity.

35.    Circle E Ranch's addresses on file with the SBA and ACC (noted above) are both single-family residences, which seem anomalous for a business representing to the SBA that it has 42 employees.

36.    Also suspicious is the fact that a search of the Nexis news database, which includes many Arizona-based publications, yielded no mention of Circle E Ranch in Arizona. Similarly, a search of the NewsBank database yielded no mention of Circle E Ranch after 2014 (four prior mentions were for different entities).

37.    Circle E Ranch's managing member (before it was terminated as an entity) was Mark S. Exposito, whose DOB is xx/xx/1966. Exposito is no stranger to the legal system. He was charged in Kansas (case no. 98CR01386 in Johnson County District Court) with passing bad checks. According to the court docket, he was convicted of this criminal felony on 12/22/1998.

38.    More recently, Exposito pleaded guilty and was convicted on 12/10/2019 in Peoria Municipal Court, AZ (case no. M-0750-TR-2019001022) to "DUI LIQUOR/DRUGS/VAPORS 1ST." *See*, Indictment attached in **Exhibit A;** Opinion and Order attached in **Exhibit B;** and court docket attached in **Exhibit C**.

39.    On 03/15/2023, Exposito was indicted by a federal grand jury for wire fraud and conspiracy to commit wire fraud (case no. 4:23-cr-00063 in the Eastern District of Texas).

**DEFENDANT CIRCLE E OIL AND CHEMICALS LLC**

40.     Defendant Circle E Oil and Chemicals LLC (**"Circle E Oil"**), was a Texas entity doing business in Arizona at 26949 North 87th Lane, Peoria, Maricopa County, AZ 85383 (according to SBA records).

41.     Circle E Oil applied and was approved for a PPP loan on June 15, 2020 (loan number 5042917901) in the amount of $459,325 and received said PPP loan. The forgiveness status of this loan is unclear from the SBA database.

42.     Circle E Oil was a Texas entity formed on January 9, 2019, and dissolved on August 20, 2021 (tax forfeiture), according to the Texas Secretary of State. Although its business address was in Arizona, it was not registered with the ACC to do business in Arizona. Its trading name in Texas was MD Auto Products.

43.     Circle E Oil reported 25 employees on its application for this PPP loan. Despite having this many employees, Circle E Oil has virtually no internet presence. A Google search of Circle E Oil yielded very few hits, with many of them from PPP databases, which seems odd for a company that claimed to have 25 employees.

44.     Also suspicious is Circle E Oil's address, which is the same address in the SBA dataset for Circle E Ranch – a single-family home on three acres of land.

45.     A search of the Nexis news database, which includes many Arizona-based publications, yielded no mention of Circle E Oil in Arizona. A search of the NewsBank database also yielded no results.

46.     Circle E Oil and Circle E Ranch share the same managing member: Mark S. Exposito, who has a criminal history detailed above.

**DEFENDANT GEORGE KROTONSKY**

47.     Defendant George Krotonsky (**"Krotonsky"**) is an individual residing in Maricopa County, AZ (according to SBA records), who appears to be a sole proprietor for purposes of his PPP loan.

48.     Krotonsky applied and was approved for a PPP loan on April 29, 2020 (loan number 3971717307) in the amount of $235,092.67, received said PPP loan, and had said PPP loan forgiven on September 13, 2021, in the amount of $238,306.68.

49.     Krotonsky reported 51 employees on his application for this PPP loan.

50.     Krotonsky applied and was approved for a second PPP loan on March 13, 2021 (loan number 2153188608) in the amount of $329,129.73 and received said PPP loan. The forgiveness status of this loan is unclear from the SBA database.

51.     Krotonsky reported 44 employees on his application for this second PPP loan.

52.     The circumstances surrounding Krotonsky's two PPP loans are very suspicious.

53.     For example, the average annual salary of Krotonsky's employees, as reported in his PPP loan applications, more than doubled in one year, increasing from $16,595 in 2020 to $35,904 in 2021.

54.     Krotonsky obtained his two PPP loans using the address of the home that he and his wife (who also obtained a PPP loan in her own name) occupied at the time: 7055 East Sweetwater Avenue in Scottsdale. The number of employees he claimed on his PPP loan applications—51 in 2020 and 44 in 2022—could not have worked in his home,

and available public records show that he owned no active "full-service restaurants" in that time period. (The NAICS code for both loans – 722511 – is the code for full-service restaurants.)

55.    Also suspicious is that while Arizona allows an individual to operate a sole proprietorship under a name other than his or her own name, most people choose a specific business name. Sole proprietors who wish to have employees need to obtain an Employer Identification Number (EIN) from the IRS. There is no indication in the public record that Krotonsky had either a restaurant in his own name or an EIN in his own name.

56.    A search of the Nexis news database, which includes many Arizona-based publications, yielded no mention of a restaurant-type enterprise associated with Krotonsky in the period during which he was a PPP borrower. A search of the NewsBank database yielded 21 results, all of them from 2005 or earlier.

57.    Finally, upon information and belief, Krotonsky (i.e. George Edward Krotonsky with DOB 10/13/1972) had a criminal case (no. CR2021-002282000 on 11/22/2021) in Maricopa County Superior Court where he was indicted for (1) failure to pay taxes (felony 5); (2) preparing a false tax return (felony 5); and (3) fraudulent schemes/artifices (felony 2).  Krotonsky and a co-defendant were convicted of three felonies, according to an Arizona Department of Revenue press release issued on May 4, 2023.[2]  He was sentenced to one-and-a-half years of imprisonment followed by seven years of supervised probation after his release.

---

[2] https://azdor.gov/media-center/latest-press-releases/news/east-valley-restaurant-owners-convicted-fraudulent-schemes

## JURISDICTION AND VENUE

58.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Although this issue is no longer jurisdictional after the 2009 amendments to the FCA, to Relator's knowledge there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, as those concepts are used in 31 U.S.C. § 3730(e), as amended by Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901-02.

59.     Moreover, whether or not such a disclosure has occurred, Relator would qualify as an "original source" of the information on which the allegations or transactions in this Complaint are based. Relator researched and discovered the pertinent entity information and individual information of each Defendant.

60.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendants' principal places of business are located in the District of Arizona as alleged above.

61.     Venue is proper in the District of Arizona pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because Defendants' principal place of business is in the District of Arizona, and because violations of 31 U.S.C. §§ 3729 *et seq*. alleged herein occurred within this district.

## THE PAYCHECK PROTECTION PROGRAM

62.     Congress added sections 1102 and 1106 of the Coronavirus Aid, Relief, and

Economic Security Act (**"CARES Act"**). Section 1102 contains a new program called

the Paycheck Protection Program (**"PPP"**) and is party of the U.S. Small Business

Administration's (**"SBA"**) 7(a) Loan Program. These two sections are intended to

provide economic relief to small businesses nationwide adversely impacted by the

coronavirus pandemic and the COVID-19 Emergency Declaration issued by President

Trump on March 13, 2020.

63.     Due to the COVID-19 emergency, many small businesses nationwide are

experiencing economic hardship as a direct result of the Federal, State, and local public

health measures that are being taken to minimize the public's exposure to the

coronavirus.

64.     The SBA received funding and authority through the CARES Act to

modify existing loan programs and establish the new PPP loan program to assist small

businesses nationwide adversely impacted by the coronavirus pandemic.

65.     Section 1102 of the Act temporarily permits SBA to guarantee 100% of

7(a) loans under the PPP. Section 1106 of the CARES Act provides for forgiveness of up

to the full principal amount of qualifying loans guaranteed under the PPP.

66.     The CARES Act was intended to provide relief to America's small

businesses expeditiously.

67.     The CARES Act gives lenders delegated authority to process loan

applications for PPP funding. SBA allowed lenders to rely on certifications of the

borrowers in order to determine eligibility of the borrower and use of loan proceeds, and to rely on specified documents provided by the borrower to determine qualifying loan amount, and eligibility for loan forgiveness. Lenders are held harmless for borrowers' failures to comply with PPP rules.

68.     Defendants submitted documentation necessary to establish eligibility such as payroll processor records, payroll tax filings, form 1099s, income and expenses documentation.

69.     In general, Defendants calculated an amount to borrow by aggregating payroll costs from the previous 12 months for employees whose principal place of residence is the United States. Annual employee salaries are capped at $100,000. Defendants then calculated the average monthly payroll cost and multiplied that amount by a factor of 2.5.

70.     On the PPP application, a representative of Defendant had to certify in good faith to a number of representations to the Federal Government. The second bullet point under the CERTIFICATIONS AND AUTHORIZATIONS section on the PPP loan application states:

> ***The Applicant is eligible to receive a loan*** under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule). [Emphasis added].

71.     Another certification on the application states, "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

72.     Each Defendant also "further certif[ied] that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects."

73.     The Defendants also certified, depending on the date of their PPP application, that no owner of Defendant (owning more than 20%) was convicted of a felony within five years preceding the date of the application.

74.     Finally, each Defendant certified that it "understand[s] that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

## ALLEGATIONS

**Sexually Oriented Businesses**

75.     Plaintiff researched Arizona entities in the sexually oriented business industry that applied for and received PPP loans. Plaintiff discovered four of the Defendants (The Candy Store, Hi-Liter Gentlemen's Club, Christie's Cabaret, and Le Girls Gentlemen's Club) were sexually oriented businesses.

76.     Federal statute, however, prohibits such businesses from receiving SBA loans. *See*, 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa), which references 13 CFR § 120.110.

77.     Further, 13 CFR § 120.110, titled *What businesses are ineligible for SBA business loans?* excludes the following businesses:

> (p) Businesses which:
> (1) *Present live performances of a prurient sexual nature*; or
> (2) *Derive directly or indirectly more than de minimis gross revenue through the sale of* products or *services, or the presentation of any depictions or displays, of a prurient sexual nature*

(Emphasis added).

78.     "Prurient" is defined as "having, inclined to have, or characterized by lascivious or lustful thoughts, desires, etc."

79.     Upon information and belief, businesses like said Defendants present live performances of a prurient sexual nature or derive more than de minimis gross revenue through the sale of services or the presentation of depictions or displays of a prurient sexual nature.

80.     Said Defendants were thus not eligible for a PPP loan, yet they falsely and fraudulently represented on their PPP loan applications that they were eligible.

81.     Said Defendants thus made material misrepresentations on their applications for PPP funds, knowing lenders and the Federal Government would rely on said representations in paying PPP funds to said Defendants who were otherwise not eligible for PPP funds.

82.     The Second Circuit in *Pharaohs GC, Inc. v. United States Small Business Administration*, 990 F.3d 217 (2nd Cir. 2021) and the Seventh Circuit in *Camelot Banquet Rooms, Inc. v. United States Small Business...*, 14 F.4th 624 (7th Cir. 2021) have

held that the SBA can prohibit strip clubs, like said Defendants, from receiving PPP loans.

**Inflated Employee Count**

83.    On the first page of the PPP application, Defendants Circle E Ranch, Circle E Oil, and Krotonsky represented the number of their employees. Said Defendants had to each certify that, "The Applicant was in operation on February 15, 2020 *and had employees* for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC." (Emphasis added).

84.    Said Defendants each further certified on their PPP loan applications, "*The Applicant will provide to the Lender documentation verifying the number of full-time equivalent employees on the Applicant's payroll* as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan." (Emphasis added).

85.    As alleged above, said Defendants fraudulently inflated their employee count in order to increase the amount of their PPP loans.

**Applying for PPP Loan Within Five Years of Fraud Conviction**

86.    Circle E Ranch and Circle E Oil certified on their PPP applications that within the last five years neither the applicant nor any owner of the applicant had been convicted or pleaded guilty for any felony. *See*, section 6 on the PPP application.

87.    Despite making this representation on their PPP applications, the managing member of these two entities, Exposito, pleaded guilty to and was convicted of a felony in 2019, well within five years of these two entities applying for PPP loans.

**General Fraud**

88.     As alleged above, Circle E Ranch, Circle E Oil, and Krotonsky represented that they were going concerns when all indications show they were either shell entities, bogus entities, or otherwise not going concerns.

89.     For example, said Defendants lacked an internet or business presence despite purporting to employ dozens of people.

90.     Said Defendants lacked a legitimate business location.

91.     Said Defendants were also terminated when they applied for PPP loans or were not registered to do business in Arizona at the time of their PPP loan applications.

92.     As further alleged above, the general circumstances surrounding the businesses represented by these Defendants on their PPP applications strained credulity.

93.     Relator reserves the right to amend this Complaint and expand these allegations upon review of the actual applications and supporting documentation submitted by Defendants.

<u>**False Claims Act**</u>

<u>**31 U.S.C. § 3729(a)(1)(A)-(B)**</u>

94.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

95.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

96.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government, or authorized agent of the United States Government, for payment or approval.

97.     By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment by the Government.

98.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented to third party lending institutions. Relator does not have access to the records of all such false or fraudulent statements or claims.

99.     Lenders, acting on behalf of the Federal Government, were guaranteed 100% of the PPP loans from the Federal Government. Said lenders were unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants. Said lenders paid the claims that would not be paid but for Defendants' illegal conduct.

100.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

101.     Additionally, the United States is entitled to a maximum penalty for each and every violation arising from Defendants' unlawful conduct alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, *qui tam* Plaintiff/Relator prays for judgment against each Defendant as follows:

1.  That this Court enter judgment against each Defendant in an amount equal to three times the damages the United Sates has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

2.  That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

3.  That Relator be awarded all costs of this action, including attorney's fees and expenses; and

4.  That Relator recover such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: 6/6/2023.                    Respectfully submitted,

J. Bryan Quesenberry
Plaintiff/Relator

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Crim. No. 4:23-63-ALM-KPJ-1 |
| | § | |
| MARK EXPOSITO (1), | § | |
| | § | |
| Defendant. | § | |
| | § | |

OPINION AND ORDER
OF DETENTION PENDING TRIAL

Defendant Mark Exposito ("Defendant") is charged in an Indictment with one count of violating 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud) and twenty-two counts of violating 18 U.S.C. § 1343 (Wire Fraud). The United States moved to detain Defendant pending trial pursuant to 18 U.S.C. § 3142(f). Upon consideration, the Court finds Defendant should be **DETAINED**.

## I.    LEGAL STANDARD

"The Bail Reform Act provides that a person shall be released pending trial unless a judge finds that 'no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *United States v. Villaurrutia*, 850 F. App'x 330, 331 (5th Cir. 2021) (per curiam) (quoting 18 U.S.C. § 3142(e)). A judicial officer may order a defendant detained pending trial upon satisfying two prerequisites. First, the officer must hold a hearing pursuant to a circumstance listed in 18 U.S.C. § 3142(f). *See United States v. Byrd*, 969 F.2d 106, 109–10 (5th Cir. 1992). Only criminal defendants whose cases involve one or more of the following circumstances may be detained pending trial:

1

- a crime of violence, a violation of section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

- an offense for which the maximum sentence is life imprisonment or death;

- an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801 *et seq.*), the Controlled Substances Import and Export Act (21 U.S.C. § 951 *et seq.*), or chapter 705 of title 46;

- any felony if such person has been convicted of two or more offenses described in subparagraphs (A) through (C) of this paragraph, or two or more state or local offenses that would have been offenses described in subparagraphs (A) through (C) of this paragraph if a circumstance giving rise to federal jurisdiction had existed, or a combination of such offenses;

- any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive, or any other dangerous weapon, or involves a failure to register under 18 U.S.C. § 2250;

- any offense if there is a serious risk that such person will flee; or

- any offense if there is a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

18 U.S.C. § 3142(f).

Second, after a hearing, the judicial officer must determine whether the United States has shown by a preponderance of the evidence that "no condition or combination of conditions will reasonably assure the appearance of the person," or by clear and convincing evidence that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community." 18 U.S.C. § 3142(e)(1), (f)(2). Section 3142(g) provides that a court shall consider the following factors in determining whether a person poses a flight risk or a danger to the community: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the defendant's history and characteristics, including, among other things, his family ties, length of residence in the community, past conduct, history relating to drug or alcohol abuse,

2

criminal history, and record concerning appearance at court proceedings; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

If, based on the foregoing factors, the judicial officer finds there are no conditions that would "reasonably assure the appearance of the person as required and the safety of any other person and the community," the judicial officer shall order the criminal defendant detained pending trial. 18 U.S.C. § 3142(e); *see also United States v. Okhumale*, 813 F. App'x 936, 939 (5th Cir. 2020) (per curiam) (holding pretrial detention requires "the presence of one of the circumstances outlined in § 3142(f) *and* a determination under § 3142(e) that . . . no conditions imposed could either assure the appearance of the defendant or the safety of the defendant and community" (citing *Byrd*, 969 F.2d at 109–10))).

## II.     PRETRIAL SERVICES REPORT[1]

Defendant advised he was born in Kansas City, Missouri in 1967, and is approximately fifty-six (56) years old. Defendant reported he graduated from Truman High School in Independence, Missouri in 1985, and that he later attended the University of Missouri-Kansas City but did not graduate. Defendant reported he had prior residences as follows: Kansas City, Missouri from 1967 to 1991; Phoenix, Arizona from 1991 to 1994; Kansas City, Missouri from 1994 to 1998; Phoenix, Arizona from 1998 to 2018; and Paulden, Arizona from 2018 to present. Defendant reported he moved to his current residence, a three-bedroom house located on eighteen acres, in 2018, and currently lives with his wife, Shawna Exposito ("Ms. Exposito"). Defendant reported he raises horses and cattle on the property.

---

[1] A Pretrial Services Report is a concise summary and conclusion of the pretrial investigation pertaining to the pretrial release of the criminal defendant. *See* 18 U.S.C. § 3154.

Defendant reported both of his parents are deceased and he does not share a close relationship with his sister, Susan Margolis, who resides in Portland, Oregon. Defendant advised he was previously married to Brenda Waymeir from 1991 to 1993 and has two children from this marriage—Christian Exposito, age twenty-nine (29), who resides in San Antonio, Texas; and Alexandria Haley, age thirty-two (32), who resides in Okinawa, Japan. Defendant advised he married his current spouse, Ms. Exposito, in 1996, and they share one child, Mark Exposito, age twenty-six (26), who resides in Chandler, Arizona.

Defendant reported he is self-employed as the owner and operator of the Circle E Ranch at his residence in Paulden, Arizona since 2015. Defendant reported a monthly income of approximately $3,000, and that he works approximately fifty (50) hours weekly. Defendant reported previous employment as the chief operating officer ("COO") for Fenton Motor Group in Frisco, Texas from 2015 to 2019. Defendant reported he was also the general manager for Camel Back Volkswagen in Phoenix, Arizona from 1998 to 2015.[2] Defendant further reported he has the following assets: a 2022 Ford F-350 vehicle valued at $80,000; a 2022 Ford F-150 vehicle valued at $70,000; a 2022 BMW X5 vehicle valued at $55,000; approximately $150,000 in his personal savings account; and a valuation of his residence at approximately $700,000. In total, Defendant's assets are approximately $1,055,000. Defendant advised Pretrial Services that his liabilities are unknown.[3] Defendant further reported he has an estimate cash flow of approximately negative (-) $5,550 with expenses as follows: $250 in utilities; $200 for cell phone payments; $1,000 in

---

[2] In reviewing the Pretrial Services Report (Dkt. 10), Defendant does not appear to have reported his income for his previous employment. Additionally, Defendant does not appear to have reported any previous employment before 1998 and, thus, there is an approximate ten-year gap in employment.

[3] In reviewing the Pretrial Services Report (Dkt. 10), Defendant provided the financial information regarding his assets and liabilities. Defendant reported owning three vehicles, but stated he could not recall any of the balances owed on these vehicles. *See id.* at 3. Additionally, the Pretrial Services Report states his liabilities are "Unknown" and Defendant's wife, Ms. Exposito, was unable to verify the financial information in this section.

groceries and supplies; $1,500 in payments for the 2022 Ford F-350 vehicle; $1,500 in payments for the 2022 Ford F-150 vehicle; $800 in payments for the 2022 BMW X5 vehicle; $800 in payments for the auto insurance; and $2,500 in court ordered obligations.

Defendant reported he has a United States passport. Defendant reported to Pretrial Services the following travel outside the United States: Mexico in 2017 for vacation; Egypt in 2018 for business; and Dubai in 2020 for business.  Defendant advised Pretrial Services he has medical conditions related to high blood pressure and high cholesterol, and is currently taking the medication, Bystolic, to treat high blood pressure as prescribed by his physician, Dr. Son Giep in Plano, Texas. Defendant reported he had used alcohol since age nineteen (19) on a daily basis with his last use approximately five years ago.

Pretrial Services conducted a criminal record check through the National Crime Information Center ("NCIC") revealing the following arrest history: Defendant was arrested in September 1987 by Walnut Creek Police Department in Walnut Creek, California and convicted in November 1987 for Make/Pass Fictious Check and Forgery, for which he received a sentence of four years probation and 180 days confinement; Defendant was arrested in May 1998 by Johnson County Sheriff's Office in Olathe, Kansas and convicted of Theft in December 1998, for which he received two years probation; and Defendant was arrested by Peoria Police Department in Peoria, Arizona for Liquor Possession Open Container in Vehicle, Driving Under Influence – Liquor/Drugs/Vapors, Driving Under Influence with Breath Alcohol Content of 0.08 or More, Reckless Driving, and Exceed 85 Miles Per Hour, for which four charges were dismissed and he received 10 days confinement in September 2021 for Driving Under Influence – Liquor/Drugs/Vapors. Ms. Exposito verified the information provided by Defendant to Pretrial Services.

### III.   DETENTION HEARING

The Court held a detention hearing on April 4, 2023 (the "Hearing"). The United States was represented by Assistant United States Attorney Matt Johnson. Defendant was represented by Robert Reddick Smith.

Special Agent Jennifer Lapiano ("Agent Lapiano"), an agent for the Federal Bureau of Investigation ("FBI") assigned to the White Collar Squad in the Frisco, Texas resident agency, testified regarding the details of the alleged offenses and the investigation leading to Defendant's arrest.

Fenton Motor Group ("FMG") was a management company headquartered in Frisco, Texas that oversaw eighteen car dealerships across five states with several hundred employees. Brad Fenton ("Mr. Fenton") was the owner and chief executive officer ("CEO") of FMG. Defendant and his co-defendant William Lavin ("Co-Defendant Lavin") were employed by FMG as COO and chief financial officer ("CFO"), respectively. Co-Defendant Lavin was originally scheduled to self-surrender on Monday, April 3, 2023. On Sunday, April 2, 2023, Co-Defendant Lavin committed suicide.

Both Defendant and Co-Defendant Lavin had a salary of approximately $240,000 with no bonuses authorized. Under FMG's corporate structure, Ethos Group was the legal entity that would provide and sell vehicle service contracts ("VSCs") related to dealership sales. In turn, Ethos Group would send approximately $750 to FMG for each VSC sold. Agent Lapiano testified Defendant and Co-Defendant Lavin transferred approximately $28 million through Automated Clearing House ("ACH") transfers from FMG bank accounts to their own personal accounts. Agent Lapiano further testified that Defendant and Co-Defendant Lavin transferred approximately $20 million back to FMG accounts at various times and in various amounts when the dealerships

began to suffer. Agent Lapiano testified that these ACH transfers required a dual authorization and that Co-Defendant Lavin created a separate account using Randall Wadell's ("Mr. Wadell") email to use in authorizing these transfers. Mr. Wadell, a secretary and receptionist employed by FMG from 2015 to 2017, informed law enforcement that he caught Co-Defendant Lavin using his computer to create the separate authorization account. Law enforcement also discovered emails from Co-Defendant Lavin to different financial institutions to make Mr. Wadell the second authorizer for these ACH transfers. When confronted by FMG employees regarding issues with the QuickBooks accounting,[4] witnesses stated that Co-Defendant Lavin ran out of FMG's headquarters with his work laptop computer and never returned to FMG's offices.

During a proffer session, Co-Defendant Lavin provided a document purporting to be a compensation plan for Ethos that included a bonus structure for Co-Defendant Lavin. This bonus structure provided that $40 was to be paid to the CFO for each VSC sold. John Alexander ("Mr. Alexander"), FMG's previous CFO, informed law enforcement there was no bonus structure within Ethos for executives, as the only bonus structure was related to car sales and provided commissions to the car dealership employees. Mr. Alexander further informed law enforcement that during his employment with FMG, he had never seen a bonus structure for the CFO and he himself had not received a salary greater than $240,000 as CFO. Agent Lapiano further testified that FMG used ADP for payroll and to generate W-2 tax forms.[5] However, Defendant and Co-Defendant Lavin sent these $40 payments through ACH transfer to their personal accounts and did not pay taxes on such payments. During the proffer session, Co-Defendant Lavin admitted that he had forged Mr. Fenton's signature authorizing a lease for a personal apartment on behalf of

---

[4] QuickBooks is an accounting software package created and sold by Intuit Inc.

[5] ADP, created by Automatic Data Processing, Inc. ("ADP"), is an online payroll and tax software.

Defendant. Mr. Fenton informed law enforcement he had no knowledge of the lease and had not authorized the lease of a personal apartment for Defendant. Mr. Wadell also admitted to law enforcement that he notarized the signature of Mr. Fenton outside of Mr. Fenton's presence for this lease and that he did not have the authority to do so.

Agent Lapiano testified that Mr. Fenton did not authorize FMG or any other legal entity to utilize company credit cards. Defendant acquired several American Express credit cards on his own credit, naming them "Circle E Ranch" and "Fenton Motor Group". Defendant assigned these credit cards to FMG employees purportedly for FMG expenses. FBI agents and analysts conducted a review of these credit card charges and have conservatively estimated approximately $3 million in fraudulent charges for Defendant's own personal benefit. For example, Defendant purchased, *inter alia*, $100,000 in airline tickets for himself and his wife, several thousands of dollars in luxury clothing items, and tens of thousands of dollars in other personal items. Defendant and Co-Defendant authorized ACH transfers to their personal accounts to then pay for these credit card charges. Co-Defendant Lavin was the only one with access to FMG's QuickBooks accounting and labeled the transfers for these fraudulent charges as legitimate business expenses.

Agent Lapiano testified that Eslam Mohamed ("Mr. Mohamed"), an Egyptian national, was the personal driver for Defendant and is the owner and operator of Chic Limo and S&M Car Sales. Defendant paid Chic Limo approximately $300,000 for Mr. Mohamed's driving services. Defendant and Co-Defendant Lavin also added Mr. Mohamed and Mr. Mohamed's family to FMG's health insurance without Mr. Fenton's authorization. Agent Lapiano testified that the principal investigative arm of the U.S. Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"), had previously stopped Mr. Mohamed on an unrelated case and contacted the FBI regarding the open investigation into Defendant. During HSI's review of Mr.

8

Mohamed's text messages on his cell phone, HSI agents discovered messages between Mr. Mohamed and Defendant regarding money transfers to Dubai. Mr. Mohamed's cell phone also contained an image purporting to be a screenshot of Defendant's Wells Fargo bank account showing an account balance of approximately $50 million. Agent Lapiano testified the bank records for this account were acquired and that there was not $50 million in Defendant's Wells Fargo bank account at the time of the purported screenshot. Defendant's communications with Mr. Mohamed revealed Defendant was trying to use Mr. Mohamed's connections with individuals overseas to obtain investors to purportedly purchase FMG. Defendant represented to Mr. Fenton that he planned on purchasing the car dealerships. Agent Lapiano testified that Defendant and Co-Defendant Lavin told multiple witnesses Mr. Fenton was to blame for FMG's business failures and that Mr. Fenton had mismanaged the car dealerships.

Agent Lapiano further testified that, following the collapse of FMG in late 2018, Defendant setup additional fraud schemes to help pay for the multi-million dollar credit card debt he had accumulated. Defendant sought to cash counterfeit checks from O.M.G. Inc., a hardware and roofing company in Agawam, Massachusetts, in May 2019. Agent Lapiano testified these checks were to be used to pay for Defendant's credit card charges and included the following: $95,600 to Tiffany Springs Nissan; $195, 200 to Tiffany Springs Nissan; $95,600 to Expo Motor Group; and $65,000 to Circle E Ranch. All of these companies listed Defendant as the account holder and these payments were identified as fraudulent by the financial institutions and returned unpaid. In August 2019, Defendant mailed forty-nine U.S. Postal Money orders, each for the payment of $1,000, to an EMG employee. These U.S. Postal Money Orders state, "From Eslam Mohamed" and "Pay to EMG 001" at address "2415 E. Camelback Rd Ste 700 Phoenix, AZ 85016". Defendant instructed the EMG employee to deposit these U.S. Postal Money Orders into his EMG

9

001 LLC account at Chase Bank. However, Chase Bank closed this account before the EMG employee made the deposit. Agent Lapiano testified that a U.S. Postal Inspector confirmed these U.S. Postal Money Orders were forgeries.

In June 2020, Defendant opened five back accounts at BB&T under the names "EMG 001 LLC", "CCC Auto LLC", "Circle E Ranch', "Circle E Oil and Chemical LLC", and "Expo Motor Group LLC". Defendant applied for and received eight fraudulent Paycheck Protection Program ("PPP") loans to these five accounts amounting in total to $2,594,355. A former EMG employee reported there were approximately ten employees at EMG, and all were let go prior to the Covid-19 pandemic. Agent Lapiano testified that a number of these fraudulent loans were transferred from the above-listed accounts to different personal accounts owned by Defendant. These transfers included transfers totaling more than $150,000 to Mr. Mohammed's companies, Chic Limo and S&M Car Sales. Agent Lapiano testified there is an ongoing investigation by law enforcement in Maryland of a larger conspiracy related to PPP loans and fraudulent bank statements and tax forms, which is related to Defendant's own PPP loan scheme. Agent Lapiano further testified that prosecutors investigating Defendant's involvement in the PPP fraud conspiracy plan to indict Defendant for these offenses as well.

In November 2020, Defendant applied to receive $104,327.41 from the U.S. Department of Agriculture's ("USDA") Seafood Trade Relief Program purportedly through the Kimball Family Seafood Group operated by William Kimball. Defendant acquired a fraudulent Commercial Fisheries Entry Commission Permit Card in the name of William Kimball and insisted that payment be made in direct deposit rather than through check. USDA investigators were aware that this request was fraudulent and provided Defendant an ACH Vendor/Miscellaneous Payment Enrollment Form in which Defendant sought to deposit the funds in his account titled "CCC Auto

LLC Account 8981" at BB&T/Trust Bank. Agent Lapiano testified that during a deposition in December 2020 related to a civil lawsuit, Defendant testified that he owned a business in Dubai named Circle E Oil. During the deposition, Defendant testified that he became involved with Circle E Oil in approximately 2015, there were no other owners, the company had no employees, and the company bought and sold oil off the market to different traders in the Middle East.

Agent Lapiano testified Defendant was a danger to the community, a serious flight risk, and has a previous history involving fraud. Agent Lapiano testified Defendant was charged with Theft in 1998 for transferring approximately $50,000 from Superior Toyota, a car dealership, into a bank account controlled by him to pay for repairs to his car and to pay his wife's cell phone bill, and creating false sales to fraudulently collect commissions. Agent Lapiano further testified that Defendant was convicted in 1987 of Make/Pass Fictious Check and Forgery.

Agent Lapiano testified that following Defendant's arrest in the underlying matter, Defendant made calls from prison to his wife and son that was surveilled by law enforcement. Defendant directed his wife and son to write checks to themselves from his bank accounts. During these calls, Ms. Exposito told Defendant that his stepmother, a former United States Senator, was reaching out to her connections in the U.S. Department of Justice ("DOJ") to aid with Defendant's release. When informed Co-Defendant Lavin had committed suicide, Defendant expressed some sympathy but voiced concern that the entirety of the case against Defendant and Co-Defendant Lavin would now fall on him. During the phone call to his son and wife, Defendant told them Mr. Fenton and Co-Defendant Lavin were to blame for the fraud. The Government further proffered that Defendant has been untruthful with Pretrial Services and has not informed them of a number of assets he possesses including his real estate, horses, livestock equipment, and livestock.

11

During cross-examination, Agent Lapiano testified that the investigation of Defendant began in early 2019, and was opened originally in the Eastern District of Oklahoma. Agent Lapiano further testified that Mr. Fenton moved FMG's headquarters from Oklahoma to Frisco, Texas several years prior to the investigation. Agent Lapiano testified that Co-Defendant Lavin had been reported to be an alcoholic.

At the conclusion of the Hearing, the Court heard arguments from the Government and Defendant, respectively. The Government argued Defendant has a forty-year history of fraud and the Government has not yet discovered how Defendant created the forged U.S. Postal Money Orders. The Government further argued that Defendant has the means to flee and is facing an indictment in the District of Maryland for his fraudulent PPP loans. The Government argued Defendant has not been forthcoming with Pretrial Services and was not honest about his financial liabilities. Defendant proffered that Defendant's stepmother will support him, including paying for his legal defense. Defendant argued that Defendant's wife, his son, and his son's wife were present in Court to support Defendant. Defendant further proffered he has a stepdaughter that is very ill and that his presence is essential to the operation of his ranch.[6] Defendant offered to surrender his United States passport and represented that he is willing to submit to conditions of pretrial release, including restrictions on financial and internet activity. Defendant did not proffer a third-party custodian or any witness.

## IV.    SECTION 3142(g) FACTORS

The Court finds, based on the evidence presented, that the Government has proven by clear and convincing evidence that no condition or combination of conditions of release will reasonably

---

[6] During the Hearing, Defendant proffered that his stepdaughter is very ill and lives in the Phoenix, Arizona area. In reviewing the Pretrial Services Report (Dkt. 10), Defendant did not advise Pretrial Services that he has a stepdaughter or any stepchildren. *See generally id.* Defendant did advise he has a daughter, Alexandria Haley, from his previous marriage and that Alexandria Haley currently resides in Okinawa, Japan. *See id.* at 3.

assure the safety of the community, and by a preponderance of the evidence that no condition or combination of conditions of release will reasonably assure Defendant's appearance as required. Additionally, the Court finds, based on the evidence presented, Defendant poses a serious risk that he will obstruct or attempt to obstruct justice.

**A. The Nature and Circumstances of the Charged Offenses and the Weight of the Evidence**

The weight of the evidence against Defendant is strong and reveals Defendant's participation in a number of fraud schemes. Additionally, the nature and circumstances of the charged offenses favor detention.

Agent Lapiano testified to the fraudulent ACH transfers from FMG accounts to Defendant and Co-Defendant Lavin's personal accounts. Additionally, Mr. Wadell told law enforcement he caught Co-Defendant Lavin using his computer to create a second authorization so as to allow Defendant and Co-Defendant to make the fraudulent ACH transfers. Mr. Wadell further advised law enforcement that he had authorized, outside of Mr. Fenton's presence, a lease for a personal apartment on behalf of Defendant. Mr. Alexander, the previous CFO of FMG, informed law enforcement that there had previously been no bonus structure and the bonus structure proffered by Co-Defendant Lavin underlying his and Defendant's fraud scheme was nonsensical, as executives did not receive commissions for individual car sales. Agent Lapiano testified HSI found communications between Mr. Mohamed, Defendant's personal driver, and Defendant regarding money transfers to Dubai and Defendant's forgery of a screenshot purporting to show Defendant had $50 million in his bank account. Agent Lapiano also testified that Defendant added Mr. Mohammed, Defendant's personal driver, and Mr. Mohamed's family to FMG's health insurance.

Following the collapse of FMG in late 2018, Defendant attempted several additional fraud schemes including: seeking to cash counterfeit checks from O.M.G. Inc.; forging U.S. Postal

Money Orders; fraudulently receiving PPP loans for five different false business bank accounts; and using forged documents to apply for the USDA's Seafood Trade Relief Program. Agent Lapiano testified to, and the Government presented evidence of, Defendant's attempted fraudulent transactions and his relationship to the bank accounts underlying the fraud schemes. Additionally, Agent Lapiano testified that a number of the companies created by Defendant had no employees and there were no other individuals who would have directed these false transactions. In sum, the weight of the evidence is strong and favors detention.

Furthermore, the nature and circumstances of the charged offenses weighs in favor of detention. In the present Indictment, Defendant faces charges of one count of violating 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud) and twenty-two counts of violating 18 U.S.C. § 1343 (Wire Fraud). Additionally, the Government represented there is an indictment forthcoming out of Maryland related to Defendant's alleged involvement in a PPP loan conspiracy. Thus, if convicted, Defendant faces a lengthy possible sentence, which presents a motive to flee. *See United States v. Xu Jia Bao*, No. 3:17-CR-547, 2017 WL 6497885, at *2 (N.D. Tex. Dec. 19, 2017) (finding defendant charged with one count of wire fraud and one count of introduction of misbranded food into United States commerce had a "motive to flee" because he faced "a possible prison sentence of approximately 46-57 months" (citing *United States v. Stanford*, 630 F. Supp. 2d 751, 755 (S.D. Tex. 2009), *aff'd*, 341 F. App'x. 979 (5th Cir. 2009))); *see also United States v. Almasri*, Crim. A. No. H–07–155, 2007 WL 2964780, at *1 (S.D. Tex. Oct. 10, 2007) (finding the severity of potential ten-year sentence weighed in favor of detention).

Based on the evidence presented, the Court finds that the weight of the evidence to support the charged offenses and the nature and circumstances of these charges, favor detention.

**B. Defendant's History and Characteristics and the Nature and Seriousness of the Danger Posed by Defendant's Release**

Defendant's criminal history and characteristics reveal a pattern of fraud. Furthermore, Defendant has shown an ability and sophistication to conduct several different fraudulent schemes and the Government has shown by clear and convincing evidence that Defendant poses a danger to the community.

Defendant has relevant criminal history to the charged offenses. In 1987, Defendant was convicted in California for Make/Pass Fictious Check and Forgery for which he received a sentence of four years probation and 180 days confinement. Approximately ten years later in 1998, Defendant was convicted in Kansas for Theft. Like the charged offenses, Defendant stole approximately $50,000 from Superior Toyota for the repair of his vehicle, to pay for his wife's cell phone bill, and to pay himself through false commissions. Additionally, at issue in this case, Defendant traveled in 2018 to Egypt and in 2020 to Dubai, allegedly for business. Agent Lapiano testified that Mr. Mohamed, an Egyptian national, communicated with Defendant regarding acquiring investors in the Middle East to purchase FMG and, significantly, regarding money transfers to Dubai. Defendant also testified during a deposition in December 2020 related to a civil lawsuit that his alleged oil trading business, Circle E Oil, is based in Dubai.

Troublingly, there are also a number of inconsistencies in Defendant's statements to Pretrial Services. Defendant advised Pretrial Services he has a monthly income of approximately $3,000 from his business, Circle E Ranch, since 2018. However, Defendant's car payments for the three vehicles purchased in 2022 *alone* exceed his monthly income and he has a negative monthly cash flow of $5,500. Defendant also did not advise Pretrial Services of his additional assets including his livestock, horses, and livestock equipment. Defendant does not appear to have reported the personal apartment that was leased on his behalf by way of the alleged underlying

15

fraud. Furthermore, Defendant did not disclose to Pretrial Services any of the purported businesses he was allegedly operating and for which he received PPP loans, including his alleged oil trading business, Circle E Oil. Defendant advised Pretrial Services his financial liabilities were unknown. However, this is inconsistent with the Government's investigation into Defendant, which revealed extensive credit card debt stemming from his alleged fraud schemes. The Government's presented evidence goes directly as to why Defendant may aver these liabilities were unknown—these liabilities are directly connected to the alleged fraud schemes for which he is presently charged and to additional possible charges related to fraudulent PPP loans. *See United States v. Karimov*, No. 4:20-CR-382, 2022 WL 1667037, at *4 (E.D. Tex. May 24, 2022) ("The Court is particularly concerned by certain behavior [the defendant] has exhibited since being indicted—including apparent misrepresentations to Pretrial Services—which cast doubt on his character and suggest that he is likely to attempt to obstruct justice." (citing *United States v. Djoko*, No. CR19-0146-JCC, 2019 WL 4849537, at *4 (W.D. Wash. Oct. 1, 2019); *United States v. Fattah*, 351 F.Supp.3d 1133, 1138 (N.D. Ill. 2019))). Additionally, Defendant's inconsistent statements regarding his financial assets, his communication with Mr. Mohamed regarding transferring funds to Dubai, his travel to Egypt in 2018 and Dubai in 2020 for business during his alleged fraud, the existence of his Dubai-based business, Circle E Oil, and the receipt of fraudulent loans for Circle E Oil are all strong evidence Defendant is a serious risk of flight.

The Court further concludes there is clear and convincing evidence that no set of conditions would ensure the safety of the community. The inquiry into whether Defendant is a danger to the community "permits consideration of a defendant's propensity to commit crime generally, 'even where only pecuniary and not physical harm might result to the community at large.'" *United States v. Ashley*, No. 4:20-CR-318, 2021 WL 1391447, at *4 (E.D. Tex. Apr. 13, 2021), *aff'd*, 850

F. App'x 270 (5th Cir. 2021) (quoting *United States v. Parr*, 399 F. Supp. 883, 888 (W.D. Tex. 1975)). In the present case, Defendant has shown an ability to commit a large number of fraud schemes with a variety of methods. As part of their fraudulent transfers from FMG accounts to his personal accounts, Defendant and Co-Defendant Lavin circumvented the dual authorization requirements by creating a separate account for Mr. Wadell without his knowledge and confirming with financial institutions that Mr. Wadell was an authorizer. Co-Defendant Lavin would then cover up these transactions by labeling them as business expenses. Following FMG's collapse, Defendant set up several additional fraud schemes to pay for the significant credit card debt he accumulated during his fraud against FMG. Defendant created five false business bank accounts and applied for PPP loans totaling $2,594,355. Defendant also attempted to fraudulently obtain $49,000 from O.M.G. Inc., through counterfeit checks. Defendant further attempted to obtain funds through forged U.S. Postal Money Orders, and the Government has yet to discover how Defendant forged these U.S. Postal Money Orders. Defendant also applied to receive $104,327.41 from the USDA's Seafood Trade Relief Program using false documents and sought to have the USDA conduct an ACH transfer to accounts registered in his name. These schemes show Defendant's ability to engage in a wide variety of fraudulent methods and against different victims.

The Court is also troubled by Defendant's statements following his arrest that highlight there is a serious risk that he will obstruct justice. Following his arrest for the underlying offenses, during phone conversations from the jail with his wife and son, Defendant directed them to withdraw funds from his bank accounts. At the center of the charged offenses is Defendant's ability and willingness to transfer stolen funds and to transfer them to a wide network of his own accounts, some of which may be foreign accounts, as well as associates such as Mr. Mohamed. Furthermore, Agent Lapiano testified that Defendant used the stolen funds in purchasing luxury personal items

17

for his wife, Ms. Exposito, and their airline travel. Defendant's desire to immediately move funds, which may in fact be illicit proceeds at issue in this case, shows a willingness to obstruct justice and avoid possible restitution. *See Karimov*, 2022 WL 1667037, at *4. Additionally, Defendant and Ms. Exposito discussed his stepmother using her political connections to influence this case. Defendant's discussion, regardless of whether his stepmother in fact agreed to do so, shows a willingness to undermine court proceedings. These statements taken together cause serious doubt as to whether Defendant would comply with the Court's orders.

Ultimately, Defendant's ability and willingness to commit a wide array of fraud against different companies, financial institutions, and agencies using a network of bank accounts, coupled with his statements to his wife and son directing them to move funds immediately after his arrest, show he is a danger to the community and is willing to obstruct justice. Furthermore, Defendant's transfer of funds to Dubai, his international travel to Egypt and Dubai, his Dubai-based business, Circle E Oil, his ability to forge documents, and the large sum of money yet to be recovered all evidence he is a serious risk of flight.

## V. CONCLUSION

For the reasons stated herein, the Government's Motion for Detention is **GRANTED**. Defendant shall be detained pending trial and, is thus, remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. Defendant must be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver

Defendant to a United States Marshal for the purpose of an appearance in connection with a court

proceeding.

**So ORDERED and SIGNED this 10th day of April, 2023.**

KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Crim. No. 4:23-63-ALM-KPJ-1 |
| | § | |
| MARK EXPOSITO (1), | § | |
| | § | |
| Defendant. | § | |
| | § | |

OPINION AND ORDER
OF DETENTION PENDING TRIAL

Defendant Mark Exposito ("Defendant") is charged in an Indictment with one count of violating 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud) and twenty-two counts of violating 18 U.S.C. § 1343 (Wire Fraud). The United States moved to detain Defendant pending trial pursuant to 18 U.S.C. § 3142(f). Upon consideration, the Court finds Defendant should be **DETAINED**.

## I.   LEGAL STANDARD

"The Bail Reform Act provides that a person shall be released pending trial unless a judge finds that 'no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *United States v. Villaurrutia*, 850 F. App'x 330, 331 (5th Cir. 2021) (per curiam) (quoting 18 U.S.C. § 3142(e)). A judicial officer may order a defendant detained pending trial upon satisfying two prerequisites. First, the officer must hold a hearing pursuant to a circumstance listed in 18 U.S.C. § 3142(f). *See United States v. Byrd*, 969 F.2d 106, 109–10 (5th Cir. 1992). Only criminal defendants whose cases involve one or more of the following circumstances may be detained pending trial:

1

- a crime of violence, a violation of section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

- an offense for which the maximum sentence is life imprisonment or death;

- an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801 *et seq.*), the Controlled Substances Import and Export Act (21 U.S.C. § 951 *et seq.*), or chapter 705 of title 46;

- any felony if such person has been convicted of two or more offenses described in subparagraphs (A) through (C) of this paragraph, or two or more state or local offenses that would have been offenses described in subparagraphs (A) through (C) of this paragraph if a circumstance giving rise to federal jurisdiction had existed, or a combination of such offenses;

- any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive, or any other dangerous weapon, or involves a failure to register under 18 U.S.C. § 2250;

- any offense if there is a serious risk that such person will flee; or

- any offense if there is a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

18 U.S.C. § 3142(f).

    Second, after a hearing, the judicial officer must determine whether the United States has

shown by a preponderance of the evidence that "no condition or combination of conditions will

reasonably assure the appearance of the person," or by clear and convincing evidence that "no

condition or combination of conditions will reasonably assure . . . the safety of any other person

and the community." 18 U.S.C. § 3142(e)(1), (f)(2). Section 3142(g) provides that a court shall

consider the following factors in determining whether a person poses a flight risk or a danger to

the community: (1) the nature and circumstances of the offense charged; (2) the weight of the

evidence; (3) the defendant's history and characteristics, including, among other things, his family

ties, length of residence in the community, past conduct, history relating to drug or alcohol abuse,

criminal history, and record concerning appearance at court proceedings; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

If, based on the foregoing factors, the judicial officer finds there are no conditions that would "reasonably assure the appearance of the person as required and the safety of any other person and the community," the judicial officer shall order the criminal defendant detained pending trial. 18 U.S.C. § 3142(e); *see also United States v. Okhumale*, 813 F. App'x 936, 939 (5th Cir. 2020) (per curiam) (holding pretrial detention requires "the presence of one of the circumstances outlined in § 3142(f) *and* a determination under § 3142(e) that . . . no conditions imposed could either assure the appearance of the defendant or the safety of the defendant and community" (citing *Byrd*, 969 F.2d at 109–10))).

## II.    PRETRIAL SERVICES REPORT[1]

Defendant advised he was born in Kansas City, Missouri in 1967, and is approximately fifty-six (56) years old. Defendant reported he graduated from Truman High School in Independence, Missouri in 1985, and that he later attended the University of Missouri-Kansas City but did not graduate. Defendant reported he had prior residences as follows: Kansas City, Missouri from 1967 to 1991; Phoenix, Arizona from 1991 to 1994; Kansas City, Missouri from 1994 to 1998; Phoenix, Arizona from 1998 to 2018; and Paulden, Arizona from 2018 to present. Defendant reported he moved to his current residence, a three-bedroom house located on eighteen acres, in 2018, and currently lives with his wife, Shawna Exposito ("Ms. Exposito"). Defendant reported he raises horses and cattle on the property.

---

[1] A Pretrial Services Report is a concise summary and conclusion of the pretrial investigation pertaining to the pretrial release of the criminal defendant. *See* 18 U.S.C. § 3154.

Defendant reported both of his parents are deceased and he does not share a close relationship with his sister, Susan Margolis, who resides in Portland, Oregon. Defendant advised he was previously married to Brenda Waymeir from 1991 to 1993 and has two children from this marriage—Christian Exposito, age twenty-nine (29), who resides in San Antonio, Texas; and Alexandria Haley, age thirty-two (32), who resides in Okinawa, Japan. Defendant advised he married his current spouse, Ms. Exposito, in 1996, and they share one child, Mark Exposito, age twenty-six (26), who resides in Chandler, Arizona.

Defendant reported he is self-employed as the owner and operator of the Circle E Ranch at his residence in Paulden, Arizona since 2015. Defendant reported a monthly income of approximately $3,000, and that he works approximately fifty (50) hours weekly. Defendant reported previous employment as the chief operating officer ("COO") for Fenton Motor Group in Frisco, Texas from 2015 to 2019. Defendant reported he was also the general manager for Camel Back Volkswagen in Phoenix, Arizona from 1998 to 2015.[2] Defendant further reported he has the following assets: a 2022 Ford F-350 vehicle valued at $80,000; a 2022 Ford F-150 vehicle valued at $70,000; a 2022 BMW X5 vehicle valued at $55,000; approximately $150,000 in his personal savings account; and a valuation of his residence at approximately $700,000. In total, Defendant's assets are approximately $1,055,000. Defendant advised Pretrial Services that his liabilities are unknown.[3] Defendant further reported he has an estimate cash flow of approximately negative (-) $5,550 with expenses as follows: $250 in utilities; $200 for cell phone payments; $1,000 in

---

[2] In reviewing the Pretrial Services Report (Dkt. 10), Defendant does not appear to have reported his income for his previous employment. Additionally, Defendant does not appear to have reported any previous employment before 1998 and, thus, there is an approximate ten-year gap in employment.

[3] In reviewing the Pretrial Services Report (Dkt. 10), Defendant provided the financial information regarding his assets and liabilities. Defendant reported owning three vehicles, but stated he could not recall any of the balances owed on these vehicles. *See id.* at 3. Additionally, the Pretrial Services Report states his liabilities are "Unknown" and Defendant's wife, Ms. Exposito, was unable to verify the financial information in this section.

groceries and supplies; $1,500 in payments for the 2022 Ford F-350 vehicle; $1,500 in payments for the 2022 Ford F-150 vehicle; $800 in payments for the 2022 BMW X5 vehicle; $800 in payments for the auto insurance; and $2,500 in court ordered obligations.

Defendant reported he has a United States passport. Defendant reported to Pretrial Services the following travel outside the United States: Mexico in 2017 for vacation; Egypt in 2018 for business; and Dubai in 2020 for business. Defendant advised Pretrial Services he has medical conditions related to high blood pressure and high cholesterol, and is currently taking the medication, Bystolic, to treat high blood pressure as prescribed by his physician, Dr. Son Giep in Plano, Texas. Defendant reported he had used alcohol since age nineteen (19) on a daily basis with his last use approximately five years ago.

Pretrial Services conducted a criminal record check through the National Crime Information Center ("NCIC") revealing the following arrest history: Defendant was arrested in September 1987 by Walnut Creek Police Department in Walnut Creek, California and convicted in November 1987 for Make/Pass Fictious Check and Forgery, for which he received a sentence of four years probation and 180 days confinement; Defendant was arrested in May 1998 by Johnson County Sheriff's Office in Olathe, Kansas and convicted of Theft in December 1998, for which he received two years probation; and Defendant was arrested by Peoria Police Department in Peoria, Arizona for Liquor Possession Open Container in Vehicle, Driving Under Influence – Liquor/Drugs/Vapors, Driving Under Influence with Breath Alcohol Content of 0.08 or More, Reckless Driving, and Exceed 85 Miles Per Hour, for which four charges were dismissed and he received 10 days confinement in September 2021 for Driving Under Influence – Liquor/Drugs/Vapors. Ms. Exposito verified the information provided by Defendant to Pretrial Services.

### III.    DETENTION HEARING

The Court held a detention hearing on April 4, 2023 (the "Hearing"). The United States was represented by Assistant United States Attorney Matt Johnson. Defendant was represented by Robert Reddick Smith.

Special Agent Jennifer Lapiano ("Agent Lapiano"), an agent for the Federal Bureau of Investigation ("FBI") assigned to the White Collar Squad in the Frisco, Texas resident agency, testified regarding the details of the alleged offenses and the investigation leading to Defendant's arrest.

Fenton Motor Group ("FMG") was a management company headquartered in Frisco, Texas that oversaw eighteen car dealerships across five states with several hundred employees. Brad Fenton ("Mr. Fenton") was the owner and chief executive officer ("CEO") of FMG. Defendant and his co-defendant William Lavin ("Co-Defendant Lavin") were employed by FMG as COO and chief financial officer ("CFO"), respectively. Co-Defendant Lavin was originally scheduled to self-surrender on Monday, April 3, 2023. On Sunday, April 2, 2023, Co-Defendant Lavin committed suicide.

Both Defendant and Co-Defendant Lavin had a salary of approximately $240,000 with no bonuses authorized. Under FMG's corporate structure, Ethos Group was the legal entity that would provide and sell vehicle service contracts ("VSCs") related to dealership sales. In turn, Ethos Group would send approximately $750 to FMG for each VSC sold. Agent Lapiano testified Defendant and Co-Defendant Lavin transferred approximately $28 million through Automated Clearing House ("ACH") transfers from FMG bank accounts to their own personal accounts. Agent Lapiano further testified that Defendant and Co-Defendant Lavin transferred approximately $20 million back to FMG accounts at various times and in various amounts when the dealerships

began to suffer. Agent Lapiano testified that these ACH transfers required a dual authorization and that Co-Defendant Lavin created a separate account using Randall Wadell's ("Mr. Wadell") email to use in authorizing these transfers. Mr. Wadell, a secretary and receptionist employed by FMG from 2015 to 2017, informed law enforcement that he caught Co-Defendant Lavin using his computer to create the separate authorization account. Law enforcement also discovered emails from Co-Defendant Lavin to different financial institutions to make Mr. Wadell the second authorizer for these ACH transfers. When confronted by FMG employees regarding issues with the QuickBooks accounting,[4] witnesses stated that Co-Defendant Lavin ran out of FMG's headquarters with his work laptop computer and never returned to FMG's offices.

During a proffer session, Co-Defendant Lavin provided a document purporting to be a compensation plan for Ethos that included a bonus structure for Co-Defendant Lavin. This bonus structure provided that $40 was to be paid to the CFO for each VSC sold. John Alexander ("Mr. Alexander"), FMG's previous CFO, informed law enforcement there was no bonus structure within Ethos for executives, as the only bonus structure was related to car sales and provided commissions to the car dealership employees. Mr. Alexander further informed law enforcement that during his employment with FMG, he had never seen a bonus structure for the CFO and he himself had not received a salary greater than $240,000 as CFO. Agent Lapiano further testified that FMG used ADP for payroll and to generate W-2 tax forms.[5] However, Defendant and Co-Defendant Lavin sent these $40 payments through ACH transfer to their personal accounts and did not pay taxes on such payments. During the proffer session, Co-Defendant Lavin admitted that he had forged Mr. Fenton's signature authorizing a lease for a personal apartment on behalf of

---

[4] QuickBooks is an accounting software package created and sold by Intuit Inc.

[5] ADP, created by Automatic Data Processing, Inc. ("ADP"), is an online payroll and tax software.

Defendant. Mr. Fenton informed law enforcement he had no knowledge of the lease and had not authorized the lease of a personal apartment for Defendant. Mr. Wadell also admitted to law enforcement that he notarized the signature of Mr. Fenton outside of Mr. Fenton's presence for this lease and that he did not have the authority to do so.

Agent Lapiano testified that Mr. Fenton did not authorize FMG or any other legal entity to utilize company credit cards. Defendant acquired several American Express credit cards on his own credit, naming them "Circle E Ranch" and "Fenton Motor Group". Defendant assigned these credit cards to FMG employees purportedly for FMG expenses. FBI agents and analysts conducted a review of these credit card charges and have conservatively estimated approximately $3 million in fraudulent charges for Defendant's own personal benefit. For example, Defendant purchased, *inter alia*, $100,000 in airline tickets for himself and his wife, several thousands of dollars in luxury clothing items, and tens of thousands of dollars in other personal items. Defendant and Co-Defendant authorized ACH transfers to their personal accounts to then pay for these credit card charges. Co-Defendant Lavin was the only one with access to FMG's QuickBooks accounting and labeled the transfers for these fraudulent charges as legitimate business expenses.

Agent Lapiano testified that Eslam Mohamed ("Mr. Mohamed"), an Egyptian national, was the personal driver for Defendant and is the owner and operator of Chic Limo and S&M Car Sales. Defendant paid Chic Limo approximately $300,000 for Mr. Mohamed's driving services. Defendant and Co-Defendant Lavin also added Mr. Mohamed and Mr. Mohamed's family to FMG's health insurance without Mr. Fenton's authorization. Agent Lapiano testified that the principal investigative arm of the U.S. Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"), had previously stopped Mr. Mohamed on an unrelated case and contacted the FBI regarding the open investigation into Defendant. During HSI's review of Mr.

Mohamed's text messages on his cell phone, HSI agents discovered messages between Mr. Mohamed and Defendant regarding money transfers to Dubai. Mr. Mohamed's cell phone also contained an image purporting to be a screenshot of Defendant's Wells Fargo bank account showing an account balance of approximately $50 million. Agent Lapiano testified the bank records for this account were acquired and that there was not $50 million in Defendant's Wells Fargo bank account at the time of the purported screenshot. Defendant's communications with Mr. Mohamed revealed Defendant was trying to use Mr. Mohamed's connections with individuals overseas to obtain investors to purportedly purchase FMG. Defendant represented to Mr. Fenton that he planned on purchasing the car dealerships. Agent Lapiano testified that Defendant and Co-Defendant Lavin told multiple witnesses Mr. Fenton was to blame for FMG's business failures and that Mr. Fenton had mismanaged the car dealerships.

Agent Lapiano further testified that, following the collapse of FMG in late 2018, Defendant setup additional fraud schemes to help pay for the multi-million dollar credit card debt he had accumulated. Defendant sought to cash counterfeit checks from O.M.G. Inc., a hardware and roofing company in Agawam, Massachusetts, in May 2019. Agent Lapiano testified these checks were to be used to pay for Defendant's credit card charges and included the following: $95,600 to Tiffany Springs Nissan; $195, 200 to Tiffany Springs Nissan; $95,600 to Expo Motor Group; and $65,000 to Circle E Ranch. All of these companies listed Defendant as the account holder and these payments were identified as fraudulent by the financial institutions and returned unpaid. In August 2019, Defendant mailed forty-nine U.S. Postal Money orders, each for the payment of $1,000, to an EMG employee. These U.S. Postal Money Orders state, "From Eslam Mohamed" and "Pay to EMG 001" at address "2415 E. Camelback Rd Ste 700 Phoenix, AZ 85016". Defendant instructed the EMG employee to deposit these U.S. Postal Money Orders into his EMG

001 LLC account at Chase Bank. However, Chase Bank closed this account before the EMG employee made the deposit. Agent Lapiano testified that a U.S. Postal Inspector confirmed these U.S. Postal Money Orders were forgeries.

In June 2020, Defendant opened five back accounts at BB&T under the names "EMG 001 LLC", "CCC Auto LLC", "Circle E Ranch', "Circle E Oil and Chemical LLC", and "Expo Motor Group LLC". Defendant applied for and received eight fraudulent Paycheck Protection Program ("PPP") loans to these five accounts amounting in total to $2,594,355. A former EMG employee reported there were approximately ten employees at EMG, and all were let go prior to the Covid-19 pandemic. Agent Lapiano testified that a number of these fraudulent loans were transferred from the above-listed accounts to different personal accounts owned by Defendant. These transfers included transfers totaling more than $150,000 to Mr. Mohammed's companies, Chic Limo and S&M Car Sales. Agent Lapiano testified there is an ongoing investigation by law enforcement in Maryland of a larger conspiracy related to PPP loans and fraudulent bank statements and tax forms, which is related to Defendant's own PPP loan scheme. Agent Lapiano further testified that prosecutors investigating Defendant's involvement in the PPP fraud conspiracy plan to indict Defendant for these offenses as well.

In November 2020, Defendant applied to receive $104,327.41 from the U.S. Department of Agriculture's ("USDA") Seafood Trade Relief Program purportedly through the Kimball Family Seafood Group operated by William Kimball. Defendant acquired a fraudulent Commercial Fisheries Entry Commission Permit Card in the name of William Kimball and insisted that payment be made in direct deposit rather than through check. USDA investigators were aware that this request was fraudulent and provided Defendant an ACH Vendor/Miscellaneous Payment Enrollment Form in which Defendant sought to deposit the funds in his account titled "CCC Auto

10

LLC Account 8981" at BB&T/Trust Bank. Agent Lapiano testified that during a deposition in December 2020 related to a civil lawsuit, Defendant testified that he owned a business in Dubai named Circle E Oil. During the deposition, Defendant testified that he became involved with Circle E Oil in approximately 2015, there were no other owners, the company had no employees, and the company bought and sold oil off the market to different traders in the Middle East.

Agent Lapiano testified Defendant was a danger to the community, a serious flight risk, and has a previous history involving fraud. Agent Lapiano testified Defendant was charged with Theft in 1998 for transferring approximately $50,000 from Superior Toyota, a car dealership, into a bank account controlled by him to pay for repairs to his car and to pay his wife's cell phone bill, and creating false sales to fraudulently collect commissions. Agent Lapiano further testified that Defendant was convicted in 1987 of Make/Pass Fictious Check and Forgery.

Agent Lapiano testified that following Defendant's arrest in the underlying matter, Defendant made calls from prison to his wife and son that was surveilled by law enforcement. Defendant directed his wife and son to write checks to themselves from his bank accounts. During these calls, Ms. Exposito told Defendant that his stepmother, a former United States Senator, was reaching out to her connections in the U.S. Department of Justice ("DOJ") to aid with Defendant's release. When informed Co-Defendant Lavin had committed suicide, Defendant expressed some sympathy but voiced concern that the entirety of the case against Defendant and Co-Defendant Lavin would now fall on him. During the phone call to his son and wife, Defendant told them Mr. Fenton and Co-Defendant Lavin were to blame for the fraud. The Government further proffered that Defendant has been untruthful with Pretrial Services and has not informed them of a number of assets he possesses including his real estate, horses, livestock equipment, and livestock.

During cross-examination, Agent Lapiano testified that the investigation of Defendant began in early 2019, and was opened originally in the Eastern District of Oklahoma. Agent Lapiano further testified that Mr. Fenton moved FMG's headquarters from Oklahoma to Frisco, Texas several years prior to the investigation. Agent Lapiano testified that Co-Defendant Lavin had been reported to be an alcoholic.

At the conclusion of the Hearing, the Court heard arguments from the Government and Defendant, respectively. The Government argued Defendant has a forty-year history of fraud and the Government has not yet discovered how Defendant created the forged U.S. Postal Money Orders. The Government further argued that Defendant has the means to flee and is facing an indictment in the District of Maryland for his fraudulent PPP loans. The Government argued Defendant has not been forthcoming with Pretrial Services and was not honest about his financial liabilities. Defendant proffered that Defendant's stepmother will support him, including paying for his legal defense. Defendant argued that Defendant's wife, his son, and his son's wife were present in Court to support Defendant. Defendant further proffered he has a stepdaughter that is very ill and that his presence is essential to the operation of his ranch.[6] Defendant offered to surrender his United States passport and represented that he is willing to submit to conditions of pretrial release, including restrictions on financial and internet activity. Defendant did not proffer a third-party custodian or any witness.

## IV.    SECTION 3142(g) FACTORS

The Court finds, based on the evidence presented, that the Government has proven by clear and convincing evidence that no condition or combination of conditions of release will reasonably

---

[6] During the Hearing, Defendant proffered that his stepdaughter is very ill and lives in the Phoenix, Arizona area. In reviewing the Pretrial Services Report (Dkt. 10), Defendant did not advise Pretrial Services that he has a stepdaughter or any stepchildren. *See generally id.* Defendant did advise he has a daughter, Alexandria Haley, from his previous marriage and that Alexandria Haley currently resides in Okinawa, Japan. *See id.* at 3.

assure the safety of the community, and by a preponderance of the evidence that no condition or combination of conditions of release will reasonably assure Defendant's appearance as required. Additionally, the Court finds, based on the evidence presented, Defendant poses a serious risk that he will obstruct or attempt to obstruct justice.

**A.  The Nature and Circumstances of the Charged Offenses and the Weight of the Evidence**

The weight of the evidence against Defendant is strong and reveals Defendant's participation in a number of fraud schemes. Additionally, the nature and circumstances of the charged offenses favor detention.

Agent Lapiano testified to the fraudulent ACH transfers from FMG accounts to Defendant and Co-Defendant Lavin's personal accounts. Additionally, Mr. Wadell told law enforcement he caught Co-Defendant Lavin using his computer to create a second authorization so as to allow Defendant and Co-Defendant to make the fraudulent ACH transfers. Mr. Wadell further advised law enforcement that he had authorized, outside of Mr. Fenton's presence, a lease for a personal apartment on behalf of Defendant. Mr. Alexander, the previous CFO of FMG, informed law enforcement that there had previously been no bonus structure and the bonus structure proffered by Co-Defendant Lavin underlying his and Defendant's fraud scheme was nonsensical, as executives did not receive commissions for individual car sales. Agent Lapiano testified HSI found communications between Mr. Mohamed, Defendant's personal driver, and Defendant regarding money transfers to Dubai and Defendant's forgery of a screenshot purporting to show Defendant had $50 million in his bank account. Agent Lapiano also testified that Defendant added Mr. Mohammed, Defendant's personal driver, and Mr. Mohamed's family to FMG's health insurance.

Following the collapse of FMG in late 2018, Defendant attempted several additional fraud schemes including: seeking to cash counterfeit checks from O.M.G. Inc.; forging U.S. Postal

Money Orders; fraudulently receiving PPP loans for five different false business bank accounts; and using forged documents to apply for the USDA's Seafood Trade Relief Program. Agent Lapiano testified to, and the Government presented evidence of, Defendant's attempted fraudulent transactions and his relationship to the bank accounts underlying the fraud schemes. Additionally, Agent Lapiano testified that a number of the companies created by Defendant had no employees and there were no other individuals who would have directed these false transactions. In sum, the weight of the evidence is strong and favors detention.

Furthermore, the nature and circumstances of the charged offenses weighs in favor of detention. In the present Indictment, Defendant faces charges of one count of violating 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud) and twenty-two counts of violating 18 U.S.C. § 1343 (Wire Fraud). Additionally, the Government represented there is an indictment forthcoming out of Maryland related to Defendant's alleged involvement in a PPP loan conspiracy. Thus, if convicted, Defendant faces a lengthy possible sentence, which presents a motive to flee. *See United States v. Xu Jia Bao*, No. 3:17-CR-547, 2017 WL 6497885, at *2 (N.D. Tex. Dec. 19, 2017) (finding defendant charged with one count of wire fraud and one count of introduction of misbranded food into United States commerce had a "motive to flee" because he faced "a possible prison sentence of approximately 46-57 months" (citing *United States v. Stanford*, 630 F. Supp. 2d 751, 755 (S.D. Tex. 2009), *aff'd*, 341 F. App'x. 979 (5th Cir. 2009))); *see also United States v. Almasri*, Crim. A. No. H–07–155, 2007 WL 2964780, at *1 (S.D. Tex. Oct. 10, 2007) (finding the severity of potential ten-year sentence weighed in favor of detention).

Based on the evidence presented, the Court finds that the weight of the evidence to support the charged offenses and the nature and circumstances of these charges, favor detention.

### B. Defendant's History and Characteristics and the Nature and Seriousness of the Danger Posed by Defendant's Release

Defendant's criminal history and characteristics reveal a pattern of fraud. Furthermore, Defendant has shown an ability and sophistication to conduct several different fraudulent schemes and the Government has shown by clear and convincing evidence that Defendant poses a danger to the community.

Defendant has relevant criminal history to the charged offenses. In 1987, Defendant was convicted in California for Make/Pass Fictious Check and Forgery for which he received a sentence of four years probation and 180 days confinement. Approximately ten years later in 1998, Defendant was convicted in Kansas for Theft. Like the charged offenses, Defendant stole approximately $50,000 from Superior Toyota for the repair of his vehicle, to pay for his wife's cell phone bill, and to pay himself through false commissions. Additionally, at issue in this case, Defendant traveled in 2018 to Egypt and in 2020 to Dubai, allegedly for business. Agent Lapiano testified that Mr. Mohamed, an Egyptian national, communicated with Defendant regarding acquiring investors in the Middle East to purchase FMG and, significantly, regarding money transfers to Dubai. Defendant also testified during a deposition in December 2020 related to a civil lawsuit that his alleged oil trading business, Circle E Oil, is based in Dubai.

Troublingly, there are also a number of inconsistencies in Defendant's statements to Pretrial Services. Defendant advised Pretrial Services he has a monthly income of approximately $3,000 from his business, Circle E Ranch, since 2018. However, Defendant's car payments for the three vehicles purchased in 2022 *alone* exceed his monthly income and he has a negative monthly cash flow of $5,500. Defendant also did not advise Pretrial Services of his additional assets including his livestock, horses, and livestock equipment. Defendant does not appear to have reported the personal apartment that was leased on his behalf by way of the alleged underlying

15

fraud. Furthermore, Defendant did not disclose to Pretrial Services any of the purported businesses he was allegedly operating and for which he received PPP loans, including his alleged oil trading business, Circle E Oil. Defendant advised Pretrial Services his financial liabilities were unknown. However, this is inconsistent with the Government's investigation into Defendant, which revealed extensive credit card debt stemming from his alleged fraud schemes. The Government's presented evidence goes directly as to why Defendant may aver these liabilities were unknown—these liabilities are directly connected to the alleged fraud schemes for which he is presently charged and to additional possible charges related to fraudulent PPP loans. *See United States v. Karimov*, No. 4:20-CR-382, 2022 WL 1667037, at *4 (E.D. Tex. May 24, 2022) ("The Court is particularly concerned by certain behavior [the defendant] has exhibited since being indicted—including apparent misrepresentations to Pretrial Services—which cast doubt on his character and suggest that he is likely to attempt to obstruct justice." (citing *United States v. Djoko*, No. CR19-0146-JCC, 2019 WL 4849537, at *4 (W.D. Wash. Oct. 1, 2019); *United States v. Fattah*, 351 F.Supp.3d 1133, 1138 (N.D. Ill. 2019))). Additionally, Defendant's inconsistent statements regarding his financial assets, his communication with Mr. Mohamed regarding transferring funds to Dubai, his travel to Egypt in 2018 and Dubai in 2020 for business during his alleged fraud, the existence of his Dubai-based business, Circle E Oil, and the receipt of fraudulent loans for Circle E Oil are all strong evidence Defendant is a serious risk of flight.

The Court further concludes there is clear and convincing evidence that no set of conditions would ensure the safety of the community. The inquiry into whether Defendant is a danger to the community "permits consideration of a defendant's propensity to commit crime generally, 'even where only pecuniary and not physical harm might result to the community at large.'" *United States v. Ashley*, No. 4:20-CR-318, 2021 WL 1391447, at *4 (E.D. Tex. Apr. 13, 2021), *aff'd*, 850

16

F. App'x 270 (5th Cir. 2021) (quoting *United States v. Parr*, 399 F. Supp. 883, 888 (W.D. Tex. 1975)). In the present case, Defendant has shown an ability to commit a large number of fraud schemes with a variety of methods. As part of their fraudulent transfers from FMG accounts to his personal accounts, Defendant and Co-Defendant Lavin circumvented the dual authorization requirements by creating a separate account for Mr. Wadell without his knowledge and confirming with financial institutions that Mr. Wadell was an authorizer. Co-Defendant Lavin would then cover up these transactions by labeling them as business expenses. Following FMG's collapse, Defendant set up several additional fraud schemes to pay for the significant credit card debt he accumulated during his fraud against FMG. Defendant created five false business bank accounts and applied for PPP loans totaling $2,594,355. Defendant also attempted to fraudulently obtain $49,000 from O.M.G. Inc., through counterfeit checks. Defendant further attempted to obtain funds through forged U.S. Postal Money Orders, and the Government has yet to discover how Defendant forged these U.S. Postal Money Orders. Defendant also applied to receive $104,327.41 from the USDA's Seafood Trade Relief Program using false documents and sought to have the USDA conduct an ACH transfer to accounts registered in his name. These schemes show Defendant's ability to engage in a wide variety of fraudulent methods and against different victims.

The Court is also troubled by Defendant's statements following his arrest that highlight there is a serious risk that he will obstruct justice. Following his arrest for the underlying offenses, during phone conversations from the jail with his wife and son, Defendant directed them to withdraw funds from his bank accounts. At the center of the charged offenses is Defendant's ability and willingness to transfer stolen funds and to transfer them to a wide network of his own accounts, some of which may be foreign accounts, as well as associates such as Mr. Mohamed. Furthermore, Agent Lapiano testified that Defendant used the stolen funds in purchasing luxury personal items

for his wife, Ms. Exposito, and their airline travel. Defendant's desire to immediately move funds, which may in fact be illicit proceeds at issue in this case, shows a willingness to obstruct justice and avoid possible restitution. *See Karimov*, 2022 WL 1667037, at *4. Additionally, Defendant and Ms. Exposito discussed his stepmother using her political connections to influence this case. Defendant's discussion, regardless of whether his stepmother in fact agreed to do so, shows a willingness to undermine court proceedings. These statements taken together cause serious doubt as to whether Defendant would comply with the Court's orders.

Ultimately, Defendant's ability and willingness to commit a wide array of fraud against different companies, financial institutions, and agencies using a network of bank accounts, coupled with his statements to his wife and son directing them to move funds immediately after his arrest, show he is a danger to the community and is willing to obstruct justice. Furthermore, Defendant's transfer of funds to Dubai, his international travel to Egypt and Dubai, his Dubai-based business, Circle E Oil, his ability to forge documents, and the large sum of money yet to be recovered all evidence he is a serious risk of flight.

## V. CONCLUSION

For the reasons stated herein, the Government's Motion for Detention is **GRANTED**. Defendant shall be detained pending trial and, is thus, remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. Defendant must be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver

Defendant to a United States Marshal for the purpose of an appearance in connection with a court

proceeding.

**So ORDERED and SIGNED this 10th day of April, 2023.**

KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE

# Exhibit C

## U.S. District Court
### Eastern District of TEXAS [LIVE] (Sherman)
### CRIMINAL DOCKET FOR CASE #: 4:23-cr-00063-ALM-KPJ-1

Case title: USA v. Exposito et al                    Date Filed: 03/15/2023

Assigned to: District Judge Amos L.
Mazzant, III
Referred to: Magistrate Judge Kimberly C
Priest Johnson

**Defendant (1)**

**Mark Exposito**                    represented by    **Scott H Palmer**
                                                        Scott H. Palmer, PC
                                                        15455 Dallas Parkway
                                                        Suite 540, LB36
                                                        Addison, TX 75001
                                                        214/987-4100
                                                        Fax: 214/922-9900
                                                        Email: scott@scottpalmerlaw.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*
                                                        *Designation: Retained*

                                                        **Robert Reddick Smith**
                                                        Law Offices of Robert R. Smith PC
                                                        500 N Akard
                                                        Suite 2150
                                                        Dallas, TX 75201
                                                        (214)237-0900
                                                        Fax: 214-237-0901
                                                        Email: rsmith@robertrsmithlaw.com
                                                        *TERMINATED: 04/15/2023*
                                                        *Designation: Retained*

                                                        **Russell Sloan Turkel**
                                                        Scott H. Palmer, PC
                                                        15455 Dallas Parkway
                                                        Suite 540, LB36
                                                        Addison, TX 75001
                                                        214-987-4100
                                                        Fax: 214-922-9900
                                                        Email: russell@scottpalmerlaw.com
                                                        *ATTORNEY TO BE NOTICED*

*Designation: Retained*

### Pending Counts

CONSPIRACY TO WIRE FRAUD
(1)
WIRE FRAUD
(2-23)

**Disposition**

### Highest Offense Level (Opening)

Felony

### Terminated Counts

None

**Disposition**

### Highest Offense Level (Terminated)

None

### Complaints

None

**Disposition**

---

### Plaintiff

**USA**

represented by **Matthew T Johnson**
US Attorney's Office - Sherman
600 East Taylor, Suite 2000
Sherman, TX 75090
903-868-9454
Fax: 903-892-2792
Email: matthew.johnson2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/15/2023 | 1 | INDICTMENT as to Mark Exposito (1) count(s) 1, 2-23, William Lavin (2) count(s) 1, 2-23. (mcg, ) (Entered: 03/16/2023) |
| 03/15/2023 | 2 | E-GOV SEALED Form AO 257 filed as to Mark Exposito (mcg, ) (Entered: 03/16/2023) |
| 03/27/2023 | | Arrest of Mark Exposito (klee, ) (Entered: 03/27/2023) |
| 03/27/2023 | | NOTICE OF HEARING as to Mark Exposito: Initial Appearance set for 3/28/2023 at 10:10 AM in Ctrm A01 (Sherman - Annex) before Magistrate Judge Christine A. Nowak. (klee, ) (Entered: 03/27/2023) |

| 03/28/2023 | 6 | NOTICE OF ATTORNEY APPEARANCE: Robert Reddick Smith appearing for Mark Exposito (Smith, Robert) (Entered: 03/28/2023) |
|---|---|---|
| 03/28/2023 | | Minute Entry for proceedings held before Magistrate Judge Christine A. Nowak: Initial Appearance and Arraignment as to Mark Exposito held on 3/28/2023 from 10:26 am - 10:30 am. Dft pled not guilty to Counts 1,2-23. Parties agreed to continue detention hearing. ( Detention Hearing set for 4/3/2023 at 10:00 AM in Ctrm 108 (Plano) before Magistrate Judge Kimberly C Priest Johnson.) Dft Location: Custody. Attorney Appearances: AUSA - Matthew Johnson; Defense - Robert Smith. No exhibits (Court Reporter Digital Recording.) (knp, ) (Entered: 03/28/2023) |
| 03/28/2023 | | ORAL MOTION for Detention by USA as to Mark Exposito. (knp, ) (Entered: 03/28/2023) |
| 03/28/2023 | | ORAL MOTION by defendant to continue detention hearing, ORDER granting as to Mark Exposito (1). Issued by Magistrate Judge Christine A. Nowak on 3/28/2023. (knp, ) (Entered: 03/28/2023) |
| 03/28/2023 | 7 | PRETRIAL ORDER as to Mark Exposito: Plea Agreement due by 4:00 PM on 5/12/2023. Final Pretrial Conference set for 6/2/2023 at 10:00 AM in Ctrm 208 (Sherman) before District Judge Amos L. Mazzant III. Signed by Magistrate Judge Christine A. Nowak on 3/28/2023. (knp, ) (Entered: 03/29/2023) |
| 03/28/2023 | 8 | SCHEDULING ORDER - PRETRIAL DISCOVERY & INSPECTION as to Mark Exposito. Signed by Magistrate Judge Christine A. Nowak on 3/28/2023. (knp, ) (Entered: 03/29/2023) |
| 03/28/2023 | 9 | ORDER pursuant to Rule 5(f)(1) as to Mark Exposito. Signed by Magistrate Judge Christine A. Nowak on 3/28/2023. (knp, ) (Entered: 03/29/2023) |
| 03/31/2023 | | Set/Reset Hearings as to Mark Exposito: Detention Hearing RESET for 4/4/2023 10:00 AM in Ctrm 108 (Plano) before Magistrate Judge Kimberly C Priest Johnson. (dm, ) (Entered: 03/31/2023) |
| 03/31/2023 | | NOTICE OF HEARING as to Mark Exposito Detention Hearing RESET for 4/4/2023 at 10:00 AM in Ctrm 108 (Plano) before Magistrate Judge Kimberly C Priest Johnson. (las, ) (Entered: 03/31/2023) |
| 04/04/2023 | 11 | E-GOV SEALED Arrest Warrant Returned Executed on 3/27/2023 in case as to Mark Exposito. (mcg, ) (Entered: 04/04/2023) |
| 04/04/2023 | | Minute Entry for proceedings held before Magistrate Judge Kimberly C Priest Johnson: Detention Hearing as to Mark Exposito held on 4/4/2023 from 1:31-3:00 pm. FBI Agent Jennifer Lapiano testified. Direct Exam: 1:32-2:20 pm, Cross Exam:2:20 -2:40 pm. Closing arguments by both counsel at 2:41 pm. Court will defer ruling at this time. Defendant remanded to USM. Dft Location: Custody, Attorney Appearances: AUSA - Matthew Johnson; Defense - Robert Smith. No exhibits. (Court Reporter: Digital Recording.) (las, ) (Entered: 04/04/2023) |
| 04/10/2023 | 12 | OPINION AND ORDER OF DETENTION PENDING TRIAL as to Mark Exposito. Signed by Magistrate Judge Kimberly C Priest Johnson on 4/10/2023. (mmc) (Entered: 04/10/2023) |
| 04/13/2023 | 13 | Unopposed MOTION to Substitute Attorney by Mark Exposito. (Attachments: # 1 Text of Proposed Order)(Turkel, Russell) (Entered: 04/13/2023) |

| 04/15/2023 | 14 | ORDER granting 13 Motion to Substitute Attorney as to Mark Exposito (1). Scott Palmer and Russell Turkel are substituted as attorneys of record for Defendant and Robert Reddick Smith is discharged from this case. Signed by Magistrate Judge Kimberly C Priest Johnson on 4/15/2023. (mmc) (Entered: 04/15/2023) |
|---|---|---|
| 04/16/2023 | 15 | PAPER TRANSCRIPT REQUEST by Mark Exposito for proceedings held on 04/04/23 before Judge Kimberly C Priest Johnson. (Palmer, Scott) (Entered: 04/16/2023) |
| 04/21/2023 | 16 | ***FILING ERROR - ATTORNEY TO REFILE - PLEASE IGNORE*** Unopposed MOTION for Leave to File *Objections to the Magistrate's Order for Pretrial Detention and Motion for De Novo Hearing* by Mark Exposito. (Attachments: # 1 Text of Proposed Order)(Palmer, Scott) Modified on 4/24/2023 (mcg, ). (Entered: 04/21/2023) |
| 04/24/2023 | | NOTICE of Deficiency regarding 16 Motion to Extend Time to File Objections and Motion for De Novo Hearing: TWO-PART PLEADING/MOTION. Correction should be made by ONE BUSINESS DAY. (mcg, ) (Entered: 04/24/2023) |
| 04/24/2023 | 17 | Unopposed MOTION for Leave to File *Motion to Extend Time to File Objections to the Magistrate's Order for Pretrial Detention* by Mark Exposito. (Attachments: # 1 Text of Proposed Order)(Palmer, Scott) (Entered: 04/24/2023) |
| 04/24/2023 | 18 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Detention Hearing as to Mark Exposito held on 4/4/2023 before Judge Johnson. Court Reporter/Transcriber: Abba Reporting, Chris Hwang, Telephone number: 518-302-6772.

**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**

Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Motion to Redact due 5/15/2023. Release of Transcript Restriction set for 7/24/2023. (slo, ) (Entered: 04/24/2023) |
| 04/25/2023 | 19 | ORDER granting 17 Motion to Extend Time to File Objections to Magistrate's Order as to Mark Exposito (1). Signed by Magistrate Judge Kimberly C Priest Johnson on 4/24/23. (dm, ) (Entered: 04/25/2023) |
| 05/02/2023 | | NOTICE of Deficiency regarding 20 Sealed Document: Document does not comply with Local Rule CV-5(a)(7)(C) and CR49(b)(1); Incorrect Docket Event. Correction should be made by ONE BUSINESS DAY. (mcg, ) (Entered: 05/02/2023) |
| 05/02/2023 | 21 | RESPONSE to 12 Memorandum Opinion, Order of Detention *Objection to Magistrate's Order of Pretrial Detention and Motion for De Novo Hearing* (Attachments: # 1 Exhibit Transcript of Detention Hearing, # 2 Exhibit Declaration of Conrad Mill, # 3 Affidavit Sworn Affidavit of Mark Exposito II)(Palmer, Scott) (Entered: 05/02/2023) |
| 05/09/2023 | 22 | Unopposed MOTION to Continue by Mark Exposito. (Attachments: # 1 Text of Proposed Order)(Turkel, Russell) (Entered: 05/09/2023) |
| 05/12/2023 | 23 | MOTION for Extension of Time to File Response/Reply as to 21 Response to Non-Motion, by USA as to Mark Exposito. (Attachments: # 1 Text of Proposed Order) |

| | | |
|---|---|---|
| | | (Johnson, Matthew) (Entered: 05/12/2023) |
| 05/15/2023 | 24 | ORDER granting 23 Motion for Extension of Time to File Response/Reply as to Mark Exposito (1). Government's response due by 5pm on 5/19/2023. Signed by District Judge Amos L. Mazzant, III on 05/15/2023. (kkc, ) (Entered: 05/15/2023) |
| 05/17/2023 | 25 | ORDER TO CONTINUE - Ends of Justice granting 22 Motion for Continuance as to by Mark Exposito. This case is RESET for Pretrial Conference on October 6, 2023, at 10:00 a.m. Signed by District Judge Amos L. Mazzant, III on 5/17/2023. (mcg, ) (Entered: 05/17/2023) |
| 05/17/2023 | 26 | PRETRIAL ORDER as to Mark Exposito: Plea Agreement due by 4:00 PM on 9/15/2023. Final Pretrial Conference reset for 10/6/2023 at 10:00 AM in Ctrm 208 (Sherman) before District Judge Amos L. Mazzant III. Signed by District Judge Amos L. Mazzant, III on 5/17/2023. (mcg, ) (Entered: 05/17/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/18/2023 04:02:25 | | |
| **PACER Login:** | lg0663 | **Client Code:** | PPP |
| **Description:** | Docket Report | **Search Criteria:** | 4:23-cr-00063-ALM-KPJ |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |